## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**TRACY DAVIS,**

   **Plaintiff,**

**vs.**                                          **Case No. 15 CV 743 JAP/WPL**

**GARDNER TURFGRASS, INC. and**
**GILBERT JONES,**

      **Defendants.**

### MEMORANDUM OPINION AND ORDER DENYING
### DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

In DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Doc.

No. 85) (Motion), filed on May 18, 2016, Defendant Gardner Turfgrass, Inc. (GTI) and

Defendant Gilbert Jones (Jones) (together, Defendants) ask the Court to dismiss all

claims asserted in the FIRST AMENDED COMPLAINT FOR RETALIATION IN

VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, FOR VIOLATION OF

THE NEW MEXICO HUMAN RIGHTS ACT, BREACH OF EXPRESS AND/OR

IMPLIED CONTRACT, AND WRONGFUL TERMINATION IN VIOLATION OF

PUBLIC POLICY, PRIMA FACIE TORT, NEGLIGENT SUPERVISION, TRAINING

DISCIPLINE, HIRING AND RETENTION AND CONSPIRACY (Doc. No. 1-2) (FAC).

Plaintiff Tracy Davis (Plaintiff) opposes the Motion. *See* PLAINTIFF'S RESPONSE TO

DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. No. 94)

(Response). On July 7, 2016, Defendants filed DEFENDANTS' REPLY TO

PLAINTIFF'S RESPONSE TO THEIR MOTION FOR JUDGMENT ON THE

PLEADINGS (Doc. No. 105) (Reply).

The Response was filed on June 13, 2016. Local Rule 7.4 provides that a response to a motion must be filed within fourteen (14) calendar days after service of a motion. The fourteen-day time period is computed under Fed. R. Civ. P. 6(a) and (d). Under Rule 6(d), however, three days are added to the fourteen day period. The time period may be extended by agreement of the parties. D.N.M. LR-Civ. 7.4(a). The Motion was filed on May 18, 2016 and was served electronically on that day. The deadline for filing the Response fell on Saturday, June 4, 2016; therefore, the deadline was extended to the Monday, June 6, 2016 under Fed. R. Civ. P. 6(a)(1)(C).

Also on June 13, 2016, the parties filed a NOTICE OF EXTENSION OF TIME TO RESPOND TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS [Document 85] AND MOTION FOR JUDGMENT ON PLEADINGS (*PARTIAL*) BY GILBERT JONES [Document 86] (Notice of Extension) stating that the parties agreed to grant Plaintiff's request for an extension of time and allow Plaintiff to file her Response on that date. Even though the time periods dictated by Rule 6(a) and (d) may be extended by agreement of all parties, the parties should have notified the Court of the agreed extension before the deadline expired. Under Local Rule 7.1(b), the failure to timely file a response "constitutes consent to grant the motion." D.N.M. LR-Civ. 7.1(b). Hence, during the week between the deadline for filing the Response, June 6, 2016, and the date on which the parties filed the notice of extension, June 13, 2016, the Court technically could have granted the Motion. The Court cautions the parties to carefully follow the Rules of Civil Procedure and this Court's Local Rules.

I.      STANDARD OF REVIEW

A.      Legal Standard

 "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A court may grant judgment on the pleadings if "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" *Mata v. Anderson*, 760 F. Supp. 2d 1068, 1082 (D. N.M. 2009) (quoting *Park Univ. Enterpr., Inc. v. Am. Cas. of Reading, PA*, 442 F.3d 1239, 1244 (10th Cir. 2006) (citation omitted)). "Any party may move for judgment on the pleadings if no material facts are in dispute and the dispute can be resolved on both the pleadings and any facts of which the Court can take judicial notice." *Id.*

Courts evaluate a motion for judgment on the pleadings under the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Klaassen v. Univ. of Kan. Sch. of Medicine*, 84 F. Supp. 3d 1228, 1237 (D. Kan. 2015) (citing *Turner v. City of Tulsa,* 525 Fed. App'x 771, 772 (10th Cir. 2013)). Under that standard, a court "accept[s] all facts pleaded by the non-moving party as true and grant[s] all reasonable inferences from the pleadings in favor of the same." *Mata*, 760 F. Supp. 2d at 1083 (citing *Park Univ. Enterpr., Inc.*, 442 F.3d at 1244). Thus, a court may grant a motion for judgment on the pleadings when the factual allegations in the complaint fail to "state a claim for relief that is plausible on its face," or when an issue of law is dispositive. *Klaassen*, 84 F. Supp. 3d at 1237 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) and *Neitzke v. Williams*, 490 U.S. 319, 326 (1989)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

3

liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556)).

        B.        Evidence submitted with the Response

       In the Response, Plaintiff argues that "[t]here are disputed issues of fact in this case, not only based on the pleadings, but based on the evidence adduced after almost 120 days of discovery." (Resp. at 1.) Plaintiff attaches to her Response excerpts from her own and Mr. Jones' depositions (Resp. Exs. 1, 7), excerpts from her responses to Mr. Jones' interrogatories (Resp. Ex. 2), a purported sworn declaration from Mr. Jones (Resp. Ex. 3), the order of non-determination from New Mexico's Department of Workforce Solutions (Resp. Ex. 4), a printout from dictionary.com (Resp. Ex. 5), a disciplinary notice purportedly given to Plaintiff on November 8, 2013 (Resp. Ex. 8), notes about Plaintiff's work performance (Resp. Ex. 9), excerpts from the GTI employee handbook (Resp. Ex. 10), and copies of emails between Mr. Stan Gardner, the owner of GTI, and Mr. Jones (Resp. Ex. 11). Nevertheless, Plaintiff has not requested that the Court convert the Motion to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d) (stating that if matters outside the pleadings are presented to and not excluded by the court, the court must treat a motion for judgment on the pleadings as a motion for summary judgment). Since the documents are not authenticated and Plaintiff has not requested a ruling on summary judgment, the Court will not consider the evidence and will not convert the Motion to a motion for summary judgment. In ruling on the Motion, however, the Court

will consider the documents attached to and incorporated into the FAC. (Doc. No. 1-2, Exs. 1–3).[1]

I.      BACKGROUND

In February 2008, Plaintiff, who is Caucasian, began working for GTI as a part-time Administrative Technician in GTI's McIntosh, New Mexico office.[2] (FAC ¶ 8.) In May 2008, Plaintiff became a full-time employee, and in December 2008, Plaintiff was promoted to Office Manager. (*Id.*) Until July 2013, Farm Manager Oscar McClure was Plaintiff's direct supervisor. (FAC ¶ 9.) During the time Mr. McClure supervised Plaintiff, she was considered an exemplary employee with the skills required to perform her work. (FAC ¶ 10.) After Mr. McClure's resignation, Stan Gardner, the owner of GTI, managed the day to day operations of GTI. (FAC ¶ 11.) For the three-month period Mr. Gardner supervised Plaintiff, she performed her job satisfactorily and was never reprimanded. (*Id.*) During her employment at GTI, Plaintiff had regular contact with customers of GTI and with the GTI accounting office, and no one complained about her work. (*Id.*)

On September 9, 2013, Mr. Jones was hired as the Farm Manager for the McIntosh location. (FAC ¶ 12.) Shortly after beginning work, Mr. Jones used the "N

---

[1] *See Mata v. Anderson*, 760 F. Supp. 2d 1068, 1083 (D. N.M. 2009) (stating that a court may consider documents to which the complaint refers if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity).  GTI has not disputed the authenticity of the excerpts from the employee handbook attached to the Complaint.
[2] McIntosh is approximately 57 miles southeast of Albuquerque, New Mexico.

word" in Plaintiff's presence.[3] (FAC ¶ 13.) Plaintiff advised Mr. Jones that she did not like the word and considered it offensive. (FAC ¶ 14.) Another employee, who worked outdoors with Mr. Jones on the sod farm, heard Mr. Jones use the "N word" constantly. (FAC ¶ 13.)

Mr. Jones used the "N word" a second time in the office in Plaintiff's and a co-worker's presence. (FAC ¶ 15.) Plaintiff again voiced her objection to the word. (*Id.*) Mr. Jones explained to Plaintiff "that the dictionary defined the 'N-word' as a non-racial slur which could be used to insult any person of any race, and that he used it that way." (*Id.*) Plaintiff asked Mr. Jones not to use the word again at work. (*Id.*) Mr. Jones used the N word in Plaintiff's presence at the office "a few more times" when Plaintiff was on the phone. (FAC ¶ 16.) Again, Plaintiff complained to Mr. Jones, and Mr. Jones told the other employees that Plaintiff did not like the word. (*Id.*)

In early November 2013, Plaintiff was ill and missed three days of work. (FAC ¶ 18.) On the fourth day, November 7, 2013, Plaintiff telephoned co-worker, Amy Hollender, and told Ms. Hollender that she was cleared to return to work that afternoon because she had been on antibiotics for 24 hours. (*Id.*) Ms. Hollender informed Plaintiff that Mr. Jones wanted Plaintiff to take the rest of the day off. (*Id.*) After the phone call, Plaintiff went into the office to give Ms. Hollender a mailbox key and a document from Plaintiff's doctor indicating that she was cleared to return to work. (FAC ¶ 19.) At approximately 4:30 pm on that day, Plaintiff scanned some invoices to send to the

---

[3] The "N word" is a euphemism used for the term, "nigger" a word that is racially offensive. According to dictionary.com, "[t]he term nigger is now probably the most offensive word in English. Its degree of offensiveness has increased markedly in recent years, although it has been used in a derogatory manner since at least the Revolutionary War." http://www.dictionary.com/browse/nigger?s=t (June 21, 2016).

accounting office by the end of the day so that the invoices "would be paid by the corporate office the next day." (FAC ¶ 20.)

The next day, November 8, 2013, Mr. Jones approached Plaintiff and reprimanded Plaintiff for "disobeying his order that she stay home" the previous day. (FAC ¶ 21.) Mr. Jones called Plaintiff "insubordinate" and "would not allow her to explain why she had come in, or that she had been medically cleared to return to work." (*Id.*) Mr. Jones also reprimanded Plaintiff for having been disrespectful to a customer. (FAC ¶ 22.) Plaintiff asked Mr. Jones for the details of the customer's complaint, but Mr. Jones "would not tell her when or with whom she had been disrespectful." (*Id.*) Mr. Jones also reprimanded Plaintiff for reducing the price of sod purchased by a long-time customer without Mr. Jones' permission. (FAC ¶ 23.) Plaintiff had reduced the price for this customer under previous managers, and Mr. Jones had not instructed Plaintiff otherwise. (*Id.*) However, Plaintiff told Mr. Jones that she was willing to "handle the situation differently in the future, based on Defendant Jones' instructions." (*Id.*) Mr. Jones told Plaintiff to "leave the office, as he was suspending her without pay for the remainder of the day." (FAC ¶ 24.) At that time, however, Mr. Jones did not issue Plaintiff a written reprimand. (*Id.*)

On Saturday, November 9, 2013, Plaintiff wrote a letter to Mr. Jones about the previous day's discussion and Mr. Jones' complaints concerning her work performance. (FAC ¶ 25.) In the letter, Plaintiff reiterated her concern about his use of the N word at the workplace. (*Id., FAC Ex. 1.*) In relevant part the letter stated:

Lastly, on a different subject, I have enjoyed a work place that was free of
harassment, of any kind, for the past five years. I want the working
environment to be as comfortable for me, and anyone else who works
here, as it has been in the past. I have, on at least three occasions, asked
you not to use the "N" word around me. I find it offensive and ugly. I
realize you are using it in a humorous connotation, but it is offensive to
me and I do not want to hear that word from anyone. Please stop using that
word while you are around me.

(*Id.*)

On Monday, November 11, 2013, Plaintiff sent her letter by email to both Mr.

Jones and Mr. Gardner, and Plaintiff handed a printed copy of the letter to Mr. Jones.

(FAC ¶ 26.) On that day, Plaintiff had arrived at work just before her usual starting time

of 8:30 am, but Mr. Jones reprimanded her for missing a 7:30 am meeting that he claimed

he had instructed Plaintiff to attend. (*Id.*) Plaintiff was not instructed to attend the

meeting. (FAC ¶ 28.) Plaintiff asked Mr. Jones what the meeting was about, but he

refused to tell her. (FAC ¶ 27.) After reading Plaintiff's letter, Mr. Jones emailed Mr.

Gardner to inform him that the letter made him very uncomfortable working with

Plaintiff. (FAC ¶ 29.) After several hours, Mr. Jones sent Plaintiff home from work,

explaining that "it was not very busy." (FAC ¶ 30.)

On November 12, 2013, when Plaintiff arrived at work, Mr. Jones called Plaintiff

into his office and with his office door open, Mr. Jones told Plaintiff "that he no longer

felt comfortable working with her, after her complaint in her November 9, 2013 letter

about his having harassed her by using the 'N-word' at work." (FAC ¶ 31.) Mr. Jones

asked Plaintiff to resign, but Plaintiff refused. (FAC ¶ 32.) Mr. Jones then terminated

Plaintiff's employment informing Plaintiff that he "could no longer be comfortable

around her, after what she had said about him in her letter." (FAC ¶ 33.)

Mr. Jones allegedly created two disciplinary notices, one purporting to have been written on November 5 or 6, 2013, and the other purporting to have been written on November 11, 2013. (FAC ¶ 35.) The two disciplinary notices "were never given to Mr. [sic] Davis to review or otherwise acknowledge prior to her termination on November 12, 2013." (*Id.*) Plaintiff did not receive any verbal or written warnings about her work from Mr. Jones prior to November 8, 2013. (FAC ¶ 36.) Plaintiff did not receive any other written disciplinary notices prior to the November 12, 2013 termination of her employment. (*Id.*) On November 12, 2013 after terminating Plaintiff's employment, Mr. Jones e-mailed to Mr. Gardner and other employees a message entitled, "Happy days are here again!" (FAC ¶ 37.)

While Plaintiff was employed at GTI, the company had a Standards of Conduct policy and a Non-Harassment policy. (FAC ¶ 38, Ex. 2.) GTI's Standards of Conduct policy stated, "[e]ach employee has an obligation to observe and follow the company's policies and to maintain proper standards of conduct at all times. If an individual's behavior interferes with the orderly and efficient operation of a department, corrective measures will be taken." (*Id.*) Some of the improper behaviors listed are "violation of the company's policies, . . . insubordination, . . . theft or dishonesty, physical harassment, sexual harassment, disrespect toward fellow employees, visitors or other members of the public, . . . poor attendance or poor performance." (*Id.*) The Standards of Conduct also stated that "discharge decisions will be based on an assessment of all relevant factors." (*Id.*) Disciplinary measures included, "verbal warning, written warning, suspension with or without pay, and/or discharge." (*Id.*) However, the Standards of Conduct also stated that "[n]othing in this policy is designed to modify our employment at will policy." (*Id.*)

9

GTI's Non-Harassment policy stated:

We prohibit harassment of one employee by another employee, supervisor or third party for any reason ["protected class"] including, but not limited to: . . . race, sex, national origin, age, . . . or any other protected class under federal, state, or local law.
. . .

The purpose of this policy is not to regulate the personal morality of employees. It is to ensure that in the workplace, no employee harasses another for any reason or in any manner. . . . While it is not easy to define precisely what harassment is, it includes: slurs, epithets, threats, derogatory comments or visual depictions, unwelcome jokes and teasing. Any employee who believes that (s)he has been harassed should report the situation immediately to one of the . . . members of management . . . If an employee makes a report to any of these members of management and the manager either does not respond or does not respond in a manner that employee deems satisfactory or consistent with this policy, the employee is required to report the situation to one of the other members of management . . . .

The company will investigate all such reports as confidentially as possible. Adverse action will not be taken against an employee because he or she in good faith, reports or participates in the investigation of a violation of this policy. Violations of this policy are not permitted and may result in disciplinary action, up to and including discharge.

(FAC Ex. 3.)

Plaintiff alleges that GTI did not investigate her reports that Mr. Jones used a racial slur. (FAC ¶ 39.) Plaintiff alleges her employment was terminated in retaliation for reporting Mr. Jones's racial slurs in violation of Plaintiff's statutory rights and in violation of GTI's policies. (FAC ¶ 40.) Plaintiff alleges that she had a reasonable expectation she would not be fired without good cause. (FAC ¶ 41.) When Plaintiff was terminated from her employment, she lost her sole source of income for supporting herself and her four children, and she suffered humiliation, depression, and other distress. (FAC ¶¶ 42–43.) Plaintiff exhausted all administrative remedies, and the Equal

Employment Opportunity Commission (EEOC) found reasonable cause to believe that GTI had violated the law. (FAC ¶ 46.)

In Count I of the FAC, Plaintiff alleges that GTI violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, when GTI terminated Plaintiff's employment in retaliation for complaining, orally and in writing, about Mr. Jones' repeated use of a racial slur. (FAC ¶¶ 47-56.) In Count II, Plaintiff asserts she was discharged in retaliation for her reports about Mr. Jones in violation of the New Mexico Human Rights Act (NMHRA) NMSA 1978 §§ 28-1-1 et seq. (FAC ¶¶ 57-68.) In Count III, Plaintiff claims that GTI breached an express or implied employment contract under which Plaintiff was promised: (1) that she would be discharged only for cause; (2) that all relevant factors would be considered in employment termination decisions; (3) that reports of workplace harassment would be investigated; and (4) that no adverse action would be taken against an employee who reported workplace harassment. (FAC ¶¶ 69-74.) In the next count, identified as Count VI,[4] Plaintiff asserts a state law claim for wrongful discharge in violation of public policy. (FAC ¶¶ 75-80.) In Count VII, Plaintiff asserts a prima facie tort claim under state law. (FAC ¶¶ 81-82.) In Count VIII, Plaintiff asserts a claim against GTI under state law for negligent supervision, training, discipline, hiring, and retention of Mr. Jones. (FAC ¶¶ 83-90.) In Count IX, Plaintiff asserts a claim under state law for civil conspiracy to violate Plaintiff's employment contract rights, and her rights under Title VII and the NMHRA. (FAC ¶¶ 91-92.)

---

[4] The FAC does not have a Count IV or a Count V.

11

III.    DISCUSSION

    A.    Plaintiff sufficiently states retaliation claims under Title VII and the NMHRA in Counts I and II.

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[5] In addition, an employer violates Title VII when an employer retaliates against an employee for opposing "any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a).[6] To state a prima facie claim for retaliation, a plaintiff must plead facts that plausibly show 1) she engaged in "protected opposition to discrimination" or "protected conduct," 2) she was subject to materially adverse action or action that a reasonable employee would consider materially adverse, and 3) a causal connection existed between the protected activity and the materially adverse action. *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). "Protected opposition can range from filing formal charges to voicing informal

---

[5] Under the NMHRA, it is unlawful for an employer to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of "race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition, or, if the employer has fifty or more employees, spousal affiliation[.]" NMSA 1978 § 28-1-7.

[6] The NMHRA also prohibits employers from engaging "in any form of ... reprisal ... against any person who has ... filed a complaint ... under the Human Rights Act." NMSA Section 28-1-7(I)(2). Because the NMHRA and Title VII are evaluated under the same standard, the Court will discuss both claims together. *Lobato v. New Mexico Environment Dept.*, 733 F.3d 1283, 1296 (10th Cir. 2013) ("The New Mexico Human Rights Act sets out the same standard for establishing wrongful discrimination as Title VII does.").

Importantly, however, Plaintiff's Title VII claim can be prosecuted only against GTI, but Plaintiff's NMHRA claim may be asserted against both GTI and Mr. Jones, because individuals can be liable under the NMHRA. The NMHRA defines "employer" as "any person employing four or more persons and any person acting for an employer." NMSA 1978 § 28–1–2B. While acknowledging that there is generally no personal liability under Title VII, the Supreme Court of New Mexico has recognized that personal liability is possible under the NMHRA. *See Sonntag v. Shaw*, 2001-NMSC-015, ¶¶ 11-12, 130 N.M. 238, 22 P.3d 1188 (holding that if exhausted, a claim can be brought against an individual under the NMHRA).

complaints to superiors." *Fye v. Oklahoma Corp. Commission*, 516 F.3d 1217, 1218

(10th Cir.  2008) (citation omitted).

To establish the first element of her *prima facie* case—protected opposition to

discrimination—a plaintiff need not prove the illegality of the allegedly discriminatory

acts she opposed; instead, she need only show that when she engaged in protected

opposition, she had a reasonable good-faith belief that the opposed behavior was

discriminatory. *Thomas v. Pillow Kingdom, Inc*., 07-CV-00824-E, 2008 WL 1924977, at

*12 (D. Colo. Apr. 30, 2008) (citing *Hertz v. Luzenac Amer., Inc.,* 370 F.3d 1014, 1015–

16 (10th Cir. 2004)).

Defendants argue that Plaintiff is not an "aggrieved party" who can assert a claim

under Title VII because Plaintiff, as a Caucasian, is not statutorily protected against racial

discrimination. Defendants further assert that Plaintiff's interests are not within the zone

of interests protected by the statute. In support of their argument, Defendants cite *Jackson*

*v. Deen*, 959 F. Supp. 2d 1346 (S.D. Ga. 2013). In *Jackson*, the plaintiff, a Caucasian,

sued popular restaurant personality Paula Deen and the manager of one of Deen's

restaurants for racial discrimination. *Id.* at 1348. The plaintiff alleged that the restaurant

manager fostered a "racially biased attitude" at the restaurant. *Id.* at 1349. The plaintiff

alleged that the manager required African-American staff to use the rear entrance, did not

permit them to use the customer restroom, and did not hire them as hostesses. *Id.* The

plaintiff alleged that the manager "repeatedly made racist jokes, often using n***** to

refer to African-Americans." *Id.* at 1350. The plaintiff claimed that, as an assistant

manager, she experienced "significant personnel management challenges[,]" which

produced "emotional and physical distress" because "[e]mployees came to her to

13

complain and for help, which she felt obligated to give but was unable to fully provide." *Id.*

    The defendants argued that the plaintiff lacked standing to pursue racial discrimination claims because she personally had not suffered racial discrimination. *Id.* The district court noted that a person who is not within a protected class must show that he is within the "zone of interests" protected by the statute. *Id.* at 1354 (citation omitted). The court noted that "plaintiffs who might be technically injured in an Article III sense but whose interests are unrelated to the statutory prohibitions in Title VII" may not assert discrimination claims under Title VII. *Id.* (citing *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011)). The court concluded that the plaintiff's interest in "harmonious working relationships with her African-American subordinates" and her desire to work "free from racial harassment" were not interests protected by Title VII. *Id.* In addition, the court determined that the plaintiff could not bring "a cause of action to remedy racial discrimination directed toward third parties." *Id.* Consequently, the court considered Plaintiff merely "an accidental victim of the alleged racial discrimination." *Id.*

    Defendants ask the Court to follow the reasoning of *Jackson* and find that Plaintiff may not sue under Title VII because Plaintiff is not an African-American, no African-Americans worked at GTI, and Mr. Jones did not use the N word in reference to Plaintiff or any other employee. In sum, Defendants contend that since the behavior Plaintiff complained of was not actually unlawful, Defendants could not have retaliated against her in violation of Title VII. Defendants assert that if the Court allows Plaintiff's claim, the Court would be imposing a general civility standard on the workplace. *See*

14

*Morris v. City of Colorado Springs*, 666 F.3d 654, 664–65 (10th Cir. 2012) (stating that Title VII does not establish "a general civility code," for the workplace).

Plaintiff argues that she is within the zone of interests protected by Title VII because she was an "employee" who was discharged in retaliation for her own opposition to Mr. Jones' illegal conduct. Plaintiff correctly points out the critical difference between the plaintiff's substantive discrimination claim in *Jackson* and Plaintiff's retaliation claim under Title VII. To assert retaliation, Plaintiff must allege she engaged in protected activity and not that she herself was the target of discrimination. Therefore, the key issue in this case is whether Plaintiff's verbal and written complaints about Mr. Jones' use of the N word can be considered "protected activity" under the statute.

In the relevant case law, a plaintiff is considered to have engaged in protected activity if she had a reasonable, good faith belief that the conduct she reported violated Title VII—even if that belief is wrong. *Duran v. LaFarge North America, Inc.*, 855 F. Supp. 2d 1243, 1250 (D. Colo. 2012) (citing *Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 385 (10th Cir. 1984)). Hence, even if Mr. Jones' use of a racial slur did not technically create a racially hostile work environment, Plaintiff may still be able to assert that she was unlawfully discharged in retaliation for complaining about Mr. Jones' conduct. Hence, the linchpin of Plaintiff's retaliatory discharge claim is the reasonableness of Plaintiff's belief that she was reporting unlawful conduct.

In *Duran*, the plaintiff, a Hispanic, was told by a co-worker that another co-worker had called him a "dirty Mexican" on one occasion. *Duran*, 855 F. Supp. 2d at 1247. The plaintiff reported the conduct to his supervisor and to his employer's human resources department, but no action was taken on the report. *Id.* Less than a month later,

15

the plaintiff was terminated for excessive use of his company-issued cell phone and for a safety violation. *Id.* The plaintiff sued his employer for retaliatory discharge alleging he was fired for reporting the racial slur. *Id.* Although the district court granted summary judgment in favor of the employer, the court found that the plaintiff had stated a prima facie case of retaliatory discharge: ". . . it is reasonable for an individual without legal training to believe that the use of a racial slur in the workplace, even if it was an isolated incident and made outside his presence, violates Title VII." Thus, the court found that the plaintiff's reports to his supervisor and to human resources could be considered protected activity. *Id.* at 1250.

*Gray v. Feed the Children, Inc.*, No. Civ. 09-662-D, 2010 WL 356398 (W.D. Okla. Jan. 22, 2010) is another illustrative case. In that case, plaintiff Gray was in charge of human resources and plaintiff Buchanan was in charge of information technology at Feed the Children, Inc. (FTC). *Id.* at *2. Neither Gray nor Buchanan was a member of a protected class. *Id.* After legal counsel for FTC and several members of the FTC board of directors (Board) were removed from office, the plaintiffs were required to examine the discharged employees' email and computer hard drives. *Id.* Four months later, plaintiff Gray reported to the Board that the employees "had engaged in certain acts of misconduct which . . . would/could [sic] generate a racially and sexually hostile work environment through certain emails." *Id.* One month later, both plaintiffs appeared before the Board and reported from their computer search that "documents transmitted involved improper racial and sexual materials as well as demonstrating other forms of misconduct[.]" *Id.* At the following month's Board meeting, both plaintiffs were discharged. *Id.* The plaintiffs

asserted they were fired in retaliation "for opposing . . . a racially hostile environment."

*Id.* The court denied the defendants' motion to dismiss the plaintiffs' retaliation claims:

> Upon careful review of the Complaint in this case, the Court finds
> minimally sufficient allegations from which an inference could be drawn
> that Plaintiffs' reports to FTC's board constituted complaints that
> Plaintiffs believed acts of racial harassment had occurred. . . . During the
> same meeting in which the board voted to terminate Plaintiffs, racially
> derogatory materials that Plaintiffs had gathered while investigating
> employee misconduct were presented. . . . Plaintiffs made accusations of
> misconduct by certain employees that constituted complaints the
> employees had engaged in acts of racial harassment. Such accusations, if
> found to be objectively reasonable and made in good faith, may constitute
> protected opposition to racial discrimination[.]

*Id.* at *4 (citations to the record omitted).

*Duran* illustrates that an employee may bring a retaliation claim even though the

employee reported the single use of a racial epithet outside of his presence, which

generally falls short of actionable racial harassment. *Gray* illustrates that persons who

complain of racial harassment need not be part of the protected class of persons under §

1981, a race discrimination statute similar to Title VII.[7] Both *Duran* and *Gray* support

Plaintiff's assertion that she reasonably believed she was complaining about illegal racial

harassment.

Defendants cite a decision in which a district court granted summary judgment to

the employer on a § 1981 retaliation claim. *Welzel v. Bernstein*, 436 F. Supp. 2d 110 (D.

D.C. 2006). In that case, the plaintiff, a Caucasian woman, was hired as the director of

human resources for RB Associates (RB), a hotel management company. *Id.* at 112. The

plaintiff alleged she was fired in retaliation for several actions, one of which was her

---

[7] The prima facie requirements for retaliation claims under § 1981 and Title VII are the same. *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015).

verbal complaint to her supervisor, James Martens (Martens), about what the plaintiff believed were his racist statements. *Id.* In November 2000, Martens visited the central reservation office (CRO) set up by the plaintiff and staffed mostly by African-Americans. *Id.* at 113. Martens discovered the basement had no windows, no ventilation, and no air conditioning. *Id.* At a private meeting shortly thereafter, Martens told the plaintiff that "when he visited the area, he 'saw two rows of black faces' looking at him." *Id.* To this, the plaintiff responded, "Jim, be careful how you say that." *Id.* Martens stood up, closed the door to the conference room, and "began to yell at her for approximately twenty minutes." *Id.* Martens said that "if RB paid more money for the position of reservation agent, RB would be able to get 'a better class of people' . . . to fill that position . . . Martens openly questioned whether RB had 'the right person in the HR position[,]' and threateningly told her that 'he was not going anywhere.'" *Id.* Plaintiff responded that "we don't take the color of a person's skin into consideration when we're making hiring decisions." *Id.* Ten months later in September 2001, the plaintiff wrote a memo requesting medical leave. In the memo, the plaintiff listed the November 2000 meeting with Martens as one of the causes of her physical and mental stress. *Id.* at 123. According to the plaintiff, the November 2000 meeting, the September 2001 letter, and three other incidents, "'spawned a stream of additional retaliatory incidents that culminated with her firing' over two years later[.]" *Id.* at 113–14.

The district court granted defendants motion for summary judgment because the plaintiff could not "satisfy the legal requirements for sustaining a claim that she engaged in oppositional activity under § 1981." *Id.* at 119–120. With regard to the November 2000 meeting with Martens, which the plaintiff characterized as the centerpiece of her

case, the court concluded that the plaintiff had not shown "it was objectively reasonable for her to believe that she was opposing a practice that violated . . . the § 1981 rights of racial minorities." *Id*. at 120. Significantly, the court stated:

> While one can certainly take offense at the abusive nature of Martens' twenty-minute tirade, it is highly significant that his comments were *not* made in the presence of any African-American, and there is *no* evidence of any racially discriminatory policy or employment practices at RB. At most, Martens may have demonstrated a racial animus to plaintiff, who is white, but there is no evidence to indicate that he engaged in any racially discriminatory practice *vis-à-vis* any African-American.

*Id.* at 121 (emphasis in original). The court also characterized the September 2001 memo as a "request for medical leave . . . [that was] purely to advance her self-interest, rather than to voice any opposition to a discriminatory employment practice or an attempt to vindicate the rights of racial minorities." *Id.* at 123.

Defendants point out the similarities between the facts of *Welzel* and this case. First, Defendants assert that like the situation in *Welzel*, no African Americans were ever present when Mr. Jones used the epithet. Second, Defendants argue that Plaintiff's November 9, 2013 memo, like the memo in *Welzel*, was primarily a self-interested complaint about Mr. Jones' criticism of her job performance. According to Defendants, Plaintiff's primary motivation in the November 9, 2013 memo was the advancement of her own work interests. Based on these contentions, Defendants ask the Court to conclude that as a matter of law, Plaintiff did not reasonably believe she was engaging in

protected activity.[8]

However, at this juncture, the Court cannot come to that conclusion. Like *Welzel*, Mr. Jones' use of the N word outside of the presence of African-Americans may not be illegal per se, but the repeated use of an offensive racial epithet carries more inherent racial animosity than the statements in *Welzel*. In addition, at the pleading stage, the Court cannot find that Plaintiff submitted her written complaint about Mr. Jones primarily to promote her own self-interest. Significantly, the *Welzel* court analyzed summary judgment evidence that undermined the plaintiff's assertion that she was reasonably and genuinely opposing racial discrimination. In fact, the court noted that the plaintiff's complaints were general in nature and mostly related to rude, abusive, and perceived unprofessional behavior by her superiors. *Welzel*, 436 F.3d at 122–25 (finding mostly "generalized complaints about her employer and, at most, an unsupported suggestion that RB has failed to comply with applicable employment laws."). The court also pointed to evidence that during the months leading up to her discharge the plaintiff had refused to submit a written plan to address poor work performance in defiance of orders from her supervisor. *Id.* The court noted that "an employee who is being criticized for performance issues may not refuse to address these issues, and instead, file a Title VII action in an obvious attempt to immunize herself from any adverse action." *Id.* at 128.

---

[8] One other case cited by Defendants, *Little v. United Technologies*, 103 F.3d 956, 960–61 (11th Cir. 1997), is not applicable here because it involved a plaintiff who reported the one-time use of a racial slur by a co-worker at a team meeting eight months after the event. *Id.* The court affirmed the dismissal of the plaintiff's Title VII and § 1981 retaliation claims finding that the racial comment, made by a co-worker and not reported to management, was not attributable to the employer. *Id.* at 960. Here, Plaintiff reported the offensive conduct by Mr. Jones, a supervisor, to GTI management. Thus, *Little* does not aid the Court in this analysis.

Finally, in this case there are specific allegations supporting Mr. Jones' retaliatory
motive.

Moreover, GTI's broad description of harassment in its Non-Harassment policy
supports Plaintiff's allegation that she reasonably believed she was complaining about
unlawful racial harassment. GTI's Non-harassment policy prohibited "harassment of one
employee by another employee, supervisor or third party for any reason . . . including, but
not limited to . . . race, color, . . . national origin, . . . ." (FAC Ex. 3.) The policy defined
harassment to include, "slurs, epithets, threats, derogatory comments or visual depictions,
unwelcome jokes and teasing." (*Id.*) The policy encourages all employees who believe
they have been harassed to report the situation immediately to management. (*Id.*) Finally,
the policy promises that GTI would investigate all reports and that adverse action would
not be taken against an employee "because he or she, in good faith, reports or participates
in the investigation of a violation of this policy." (*Id.*)

In analyzing retaliatory discharge claims, courts recognize that employees are not
legal scholars. *See, e.g., Thornton v. Morgan Stanley Smith Barney, LLC,* No. 12-CV-
298-TCK-FHM, 2014 WL 8849988, at *17–18 (N.D. Okla. Nov. 26, 2014) (concluding
that the plaintiff formed a reasonable, good-faith, though mistaken, belief that she was
complaining about gender discrimination when she informed supervisor that manager
was having an affair with an account representative); *Rodriguez v. Wet Ink, LLC,* No. 08–
cv–0857–MSK, 2014 WL 287339, at *2–3 (D. Colo. Jan. 27, 2014) (finding that
employee, who reported that her supervisor viewed pornography at work and made sexist
remarks about women, reasonably believed that the conduct was unlawful sexual
harassment). Courts also emphasize that allowing employees to bring retaliation claims

under this standard has an overall positive effect on the workplace. *See Bd. of Cnty.
Comm'rs, Fremont Cnty., Colo., v. EEOC,* 405 F.3d 840, 852 (10th Cir. 2005) ("Title VII
permits employees to maintain retaliation claims based on a reasonable good-faith belief
that the underlying conduct violated Title VII. This empowers employees to report what
they reasonably believe is discriminatory conduct without fear of reprisal."); *Crumpacker
v. Kan. Dep't of Human Res.,* 338 F.3d 1163, 1172 (10th Cir. 2003) (explaining that any
other rule would reduce the incentive for asserting otherwise valid claims at the
"margins" of Title VII). The Court concludes that Plaintiff sufficiently alleged facts
supporting her reasonable, good faith belief that her supervisor's repeated and
unapologetic use of an offensive racial epithet was unlawful under Title VII. Stated
differently, Defendants have failed to convince the Court that, as a matter of law, Plaintiff
could not have reasonably believed she was opposing unlawful racial harassment. Hence,
the Court will deny the Motion as to Counts I and II.

B.      Plaintiff's Count III claim for breach of implied contract is viable.

In New Mexico, employment is generally for an indefinite period and is
terminable at the will of either party. *Hartbarger v. Frank Paxton Co.*, 1993-NMSC-029,
¶ 4, 857 P.2d 776, 115 N.M. 665. New Mexico courts have recognized two exceptions to
the general rule of at-will employment: wrongful discharge in violation of public policy
and an implied contract that restricts the employer's power to discharge. *Id.* The second
exception is the basis for Plaintiff's Count III claim.[9]

---

[9] Although Plaintiff identifies her claim as based on an express and/or implied contract, her Response
focuses on the legal requirements for an implied employment contract. Therefore, the Court finds that
Plaintiff has failed to state and support a claim for breach of express contract.

Plaintiff alleged that Defendants breached a two-fold implied contract. First,

Plaintiff contends that GTI breached an implied contract created under GTI's Non-

harassment policy, which required (1) that all reports of workplace harassment would be

investigated; and (2) that no adverse action would be taken against an employee who

reported workplace harassment. (FAC ¶ 71.) Second, Plaintiff asserts that GTI breached

the implied contract created under GTI's Standards of Conduct, which required (1) that

Defendants would consider all relevant factors in termination of employment decisions;

and (2) that Plaintiff would be "terminated only for cause." (FAC ¶¶ 71–72.)[10]

Defendants contend that GTI's Standards of Conduct explicitly affirm Plaintiff's

at will employment status. Defendants also argue that neither the Standards of Conduct

nor the Non-Harassment policy was sufficiently explicit to create the reasonable

expectation of an implied employment contract. *See Sanchez v. The New Mexican*, 1987-

NMSC-059, ¶ 12, 738 P.2d 1231, 106 N.M. 76 (noting that the evidence supported the

employer's contention that the handbook lacked specific contractual terms evidencing the

intent to form a contract).

> 1.      Plaintiff has stated a claim for breach of implied contract to
>         consider all relevant factors and to discharge only for
>         cause.

In New Mexico, an employer may create an implied contract with "a promise,

representation or conduct, sufficiently specific to create a reasonable expectation in the

---

[10] In her Response, Plaintiff claims that Defendants breached an implied contract to terminate her only for good cause "after receiving progressive discipline." However, the FAC does not include the allegation that Plaintiff had an implied contract that she would be discharged after receiving progressive discipline. (*See* FAC ¶ 72) ("Plaintiff had an expectation that she would not be fired without good cause but was fired without just cause."). Thus, the Court will not consider the allegation concerning progressive discipline in this ruling.

mind of [the employee] that [the employee] could be discharged only for cause." NMRA,

Civ. UJI 13-2302. To determine whether an employee's expectation is reasonable, a fact

finder may consider any oral statements, conduct, writings, handbooks, and procedures

used by the employer. *Id.* Generally, it is for the jury to decide whether an employer's

words and conduct support a reasonable expectation on the part of employees that they

will be dismissed only in accordance with specified procedures or for specified reasons.

*Clayton v. Vanguard Car Rental U.S.A., Inc.*, 761 F. Supp. 2d 1210, 1274–75 (D. N.M.

2010) (denying summary judgment on claim that employer created an implied contract).

      In *Clayton*, the court denied defendant's motion for summary judgment on the

plaintiff's claim that she could be fired only after following progressive discipline

procedures. *Id.* at 1774. In that case, the employee's handbook stated that it did not

constitute "an expressed or implied employment contract" and that the employment was

at will. *Id.* The handbook also provided:

> The specific nature of the offense will ultimately guide the level and
> course of corrective action. Suspension or termination is sometimes
> appropriate for certain types of offenses. There may be situations where
> these steps may be bypassed due to the serious nature of the offense.
>
> Corrective Action may involve four sequential steps:
>
> • Step I Coaching Discussion
>
> • Step II Documented Discussion
>
> • Step III Written Warning
>
> • Step IV Final Disposition

*Id.* The handbook further stated, "[d]epending on the severity of a situation or policy

violation, disciplinary action up to and including immediate termination may be taken at

the Company's sole discretion." *Id.* The court found that based on the language of the

handbook as a whole, "[a] factfinder could find that . . . Vanguard would follow its progressive discipline policies before terminating an employee, except in situations involving serious offenses—where the employee could be terminated without progressive discipline." *Id.*

Plaintiff argues that GTI's Standards of Conduct contains language sufficient to constitute a contract requiring that all relevant factors would be considered in all discharge decisions and that she would be terminated only for good cause. GTI's Standards of Conduct states in relevant part:

> Each employee has an obligation to observe and follow the company's policies and to maintain proper standards of conduct at all times. If an individual's behavior interferes with the orderly and efficient operation of a department, corrective disciplinary measures will be taken.
>
> Disciplinary action may include a verbal warning, written warning, suspension with or without pay, and/or discharge. The appropriate disciplinary action imposed will be determined by the company. The company does not guarantee that one form of action will necessarily precede another.
>
> Among other things, the following may result in disciplinary action, up to and including discharge: violation of the company's policies or safety rules; insubordination; . . . physical harassment; sexual harassment; disrespect toward fellow employees, visitors or other members of the public; . . . poor attendance or poor performance. . . . We emphasize that discharge decisions will be based on an assessment of all relevant factors.
>
> Nothing in this policy is designed to modify our employment at will policy.

(FAC Ex. 2.) This language is sufficiently explicit to support a claim that GTI created an implied contract that Plaintiff would only be fired for cause and that by firing Plaintiff

without just cause, GTI breached that implied contract.[11] *Compare Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 766 P.2d 280, 284 (1988)(finding fact issue precluded summary judgment on evidence that manual contained no provision that employment was at will but that management gave employee oral assurances that employee would be fired only for cause); *with Zarr v. Washington Tru Solutions, LLC*, 2009-NMCA-050, ¶ 22, 146 N.M. 274, 208 P.3d 919 (finding that oral instructions to supervisory employee on how to administer progressive discipline, without more, did not create implied contract that altered supervisory employee's at will employment). In addition, the statement in GTI's manual that all relevant factors would be considered in a discharge decision reinforces the conclusion that employees could be fired at GTI only for good cause after considering all relevant factors. *Cf. West v. Washington Tru Solutions, LLC*, 2010-NMCA-001, ¶ 23, 147 N.M. 424, 224 P.3d 651 (noting that progressive discipline policy supported denial of summary judgment and created genuine issue of fact as to an implied contract to discharge only for cause).

> 2.  Plaintiff has stated a claim for breach of implied contract based on GTI's Non-harassment policy.

Defendants next argue that Plaintiff has failed to sufficiently allege that she had an implied contract based on promises in GTI's Non-harassment policy: (1) that all reports of workplace harassment would be investigated; and (2) that no adverse action would be taken against an employee who reported workplace harassment. (FAC ¶ 71.) Defendants cite *Clayton* to support their argument that Plaintiff cannot claim she had an

---

[11] Notably, Plaintiff also alleged that Mr. Jones created written disciplinary notices after he discharged her from which the inference can be drawn that Mr. Jones wanted to give the appearance that he fired her for cause and that the disciplinary steps from GTI's policy were followed. (FAC ¶¶ 35–36.)

implied contract based on this policy. In *Clayton*, the plaintiff also alleged that he had an implied contract based on Vanguard's anti-harassment policy. That policy stated, "[d]iscrimination and harassment will not be tolerated . . . Vanguard encourages and expects reporting of all instances of harassment or discrimination. . . . Retaliation against anyone who, in good faith, reports discrimination [or harassment] is strictly prohibited and will result in discipline up to an including termination." *Clayton*, 761 F. Supp. 2d at 1277. The policy also stated that reports of discrimination or harassment would be "promptly and thoroughly investigated." *Id.* The *Clayton* court found that the language in Vanguard's handbook failed to create an implied contract concerning the treatment of discrimination complaints. *Id.* The court concluded that "the language of an employer's antidiscrimination policy that solely contains a general statement of adherence to anti-discrimination laws does not create an implied contract." *Id.* at 1279. "[T]he Court believes that the statements in Vanguard's policies regarding investigation of complaints of discrimination set forth general guidelines for the investigation process, but do not contractually guarantee employees a right to investigation of a discrimination complaint." *Id.* at 1280.

    This Court, however, concludes that GTI's Non-harassment policy is more than a "general statement of adherence to anti-discrimination laws." GTI described what constituted harassment in detail, assured employees that it would investigate reports of harassment, and stated that it would not retaliate against employees who made reports. Thus, the Plaintiff has sufficiently alleged that an implied contract arose out of the language in GTI's Non-harassment policy that it would investigate all reports of harassment and would refrain from taking adverse action against a reporting employee. In

27

addition, GTI's Non-harassment policy states emphatically that [v]iolations of this policy are not permitted and may result in disciplinary action, up to and including discharge." *But cf. Ruegsegger v. Western N.M. Univ. Bd. of Regents*, 2007-NMCA-030, ¶ 30, 141 N.M. 306, 154 P.3d 681 (ruling that language in student handbook did not create an implied contract that the University would conduct a specific kind of investigation, would provide support services, or would impose specific sanctions against perpetrators of sexual assault on student). Therefore, the Court will not dismiss Plaintiff's claim that GTI's Standards of Conduct and Non-harassment policy created an implied contract and that GTI breached the contract by discharging Plaintiff in retaliation for reporting harassment.

> C.     Plaintiff's Count VI claim for wrongful termination in violation of public policy will stand.

Plaintiff claims that New Mexico has a public policy against discharging employees who report race-based workplace harassment by "supervisory employees in positions of authority."(FAC ¶ 76.) Plaintiff claims that her objections to Mr. Jones' use of racial slurs at work and her written report to Mr. Gardner "triggered her termination by Defendants." (FAC ¶ 77.) Plaintiff asserts that Defendants' wrongful discharge was "intentional, wanton, willful and malicious." (FAC ¶ 78.) Plaintiff maintains that since reporting racial harassment is conduct that New Mexico encourages through its anti-discrimination law–the NMHRA–she may assert a state tort claim that she was fired in violation of New Mexico public policy.

New Mexico recognizes a public-policy exception to the at will employment doctrine. *Hartbarger*, 1993-NMSC-029, ¶ 4. Thus, an employee may recover in tort when

the termination of his employment contravenes a clear mandate of public policy. *Chavez v. Manville Prods. Corp.*, 1989-NMSC-050, ¶¶ 16–20, 108 N.M. 643, 777 P.2d 371 (finding that plaintiff submitted sufficient evidence of discharge in retaliation for protesting his employer's use of plaintiff's name in lobbying efforts). In New Mexico, courts determine on a case-by-case basis whether an employee has stated a sufficient public policy to support this type of claim. *Garrity v. Overland Sheep Co.*, 1996-NMSC-032, ¶ 24, 121 N.M. 710, 917 P.2d 1382 (concluding that report of drug abuse by supervisor was insufficient to support retaliatory discharge claim). "[W]hen evaluating a retaliatory-discharge claim . . . the courts must determine on a case-by-case basis whether the employee's actions furthered some singularly public purpose or served primarily to benefit the private interest of the employer or employee." *Id. Compare Salazar v. Furr's, Inc.*, 629 F. Supp. 1403, 1409 (D. N.M. 1986) (granting motion to dismiss claim of discharge in retaliation for marrying employee of employer's competitor but denying motion to dismiss the plaintiff's wrongful discharge claim where the plaintiff alleged she was terminated to prevent vesting of her pension benefits in violation of policies underlying ERISA); *with Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985) (stating that discharge for use of employer's grievance procedure did not violate public policy).

Defendants maintain that Plaintiff's complaint about a racial epithet does not implicate an important public policy because the "use of the N-word in the workplace" devoid of African-Americans is not conduct prohibited by public policy. (Mot. at 21.) However, Plaintiff's complaint is not the basis for her claim. Instead, Plaintiff claims that she was discharged from her employment after she complained about what she

reasonably thought was racial harassment. The public policy violated here is New Mexico's policy of encouraging the reporting of racial harassment. And, New Mexico courts have found that an employer who discharges an employee in violation of the NMHRA is also subject to a state law tort claim of discharge in violation of public policy. *See Gandy v. Wal-Mart Stores, Inc.*, 117 N.M. 441, 872 P.2d 859, 862 (1994) (holding that violation of NMHRA supports claim for discharge in violation of public policy despite NMHRA's provision of recovery and noting that double recovery can be avoided); *Owen v. Market*, No. 15 CV 314 JCH/KBM, 2016 WL 3574159, ** 3–4 (D. N.M. April 5, 2016) (allowing amendment of complaint to add claim that plaintiff was fired for reporting employer's overtime pay violations under state minimum wage law because the proposed amendment sufficiently alleged a claim of discharge in violation of public policy). Under New Mexico law, therefore, a plaintiff may bring a claim that she was discharged in retaliation for opposing conduct made unlawful by the NMHRA as a separate tort claim. *Gandy*, 872 P.2d at 862 (noting that NMHRA is not an exclusive remedy for retaliatory discharge). Since Plaintiff claims she was fired for reporting racial harassment, an act "that public policy would encourage" and which is embodied in the NMHRA, the Court will not dismiss Count VI. *Shovelin v. Cent N.M. Elec. Coop.*, 115 N.M. 293, 850 P.2d 996, 1006 (1993) ("For an employee to recover under this new cause of action, he must demonstrate that he was discharged because he performed an act that public policy has authorized or would encourage, or because he refused to do something required of him by his employer that public policy would condemn.").

D.      The Court will not dismiss Plaintiff's Count VII claim for prima facie tort.

In Count VII, Plaintiff alleges that if she fails in proving her retaliatory discharge claims or her breach of contract claims, she may assert an alternative claim for prima facie tort against GTI and Mr. Jones. To state a claim for prima facie tort, a plaintiff must allege (1) an intentional and lawful act; (2) with intent to injure the plaintiff; (3) injury to the plaintiff cause by the act; and (4) the absence of justification for the injurious act. *Healthsource, Inc. v. X-Ray Assocs. of N.M.*, 2005-NMCA-097, ¶ 34, 138 N.M. 70, 116 P.3d 861. Necessarily, this claim is an alternative claim. *Hill v. Cray Research*, 864 F. Supp. 1070, 1080 (D. N.M. 1991) (dismissing a prima facie tort claim because factual allegations stated a claim for another type of established tort). However, if a plaintiff merely re-alleges the facts in support of the other causes of action, adding only a bare recital of the elements of prima facie tort relating to intent and justification, a court should dismiss it "as a means of avoiding the more stringent requirements of other torts." *Id.* (claims may not be duplicative). Defendants argue that Plaintiff has done just that: used identical facts to support her prima facie tort claim in order to avoid the more stringent requirements of her other claims. But, Defendants fail to recognize that by pleading the prima facie tort claim in the alternative, Plaintiff has not attempted to "avoid the more stringent requirements" of the other claims. The New Mexico Court of Appeals has stated, "while a plaintiff may plead prima facie tort in the alternative, . . . where a plaintiff does not assert any separate factual basis to support its prima facie tort claim, **and the plaintiff's proof is susceptible to submission under another tort**, the action should be submitted to the jury on the other cause of action and not as a prima facie tort claim." *Guest v. Allstate Inc. Co.*, 2009-NMCA-037, ¶ 33, 145 N.M. 797, 205 P.3d 844,

31

*rev'd in part, on other grounds Guest v. Allstate Ins. Co.,* 2010-NMSC-047, 149 N.M. 74, 244 P.3d 342 (citations omitted) (emphasis added). Therefore, if Plaintiff's proof is susceptible to submission of the other claims to the fact finder, only then, will the Court dismiss Plaintiff's prima facie tort claim.

Plaintiff argues that she has sufficiently alleged facts to support her prima facie tort claim because the facts support an inference that Mr. Jones' and GTI's discharge for complaining about the use of a racial epithet was intentional, malicious, and not justifiable, even if, under these circumstances, the discharge is determined to be lawful. The Court agrees with Plaintiff. Prima facie tort "is intended to provide a remedy for persons harmed by acts that are intentional and malicious, but otherwise lawful, which fall outside the rigid traditional tort categories." *Guest v. Allstate Inc. Co.*, 2009-NMCA-037, ¶ 33, 145 N.M. 797, 205 P.3d 844, *aff'd in part, rev'd in part, on other grounds by Guest v. Allstate Ins. Co.,* 2010-NMSC-047, 149 N.M. 74, 244 P.3d 342. Hence, Plaintiff may assert an alternative claim of prima facie tort.

E.    Plaintiff's Count VIII claim against GTI for negligent supervision, training, discipline, hiring, and retention will not be dismissed.

Plaintiff alleged that (1) GTI failed to conduct a reasonable background evaluation or hiring protocol before hiring Mr. Jones, (2) GTI knew or should have known that Mr. Jones was regularly using racial epithets at work and failed to discipline him, (3) GTI failed to train Mr. Jones not to engage in racial harassment or discrimination, and/or (4) after GTI knew about Mr. Jones' use of a racial epithet and his negative attitude toward African Americans, GTI negligently retained Mr. Jones and

ratified Mr. Jones' conduct by supporting Mr. Jones' decision to fire Plaintiff for opposing Mr. Jones' behavior. (FAC ¶¶ 83–88.)

An employer is liable if the employer acts negligently in hiring or retaining an employee which the employer knows, or should know through the exercise of reasonable care, is incompetent or unfit. *Lessard v. Coronado Paint & Decorating Center, Inc.*, 2007-NMCA-122, ¶ 28, 142 N.M. 583, 168 P.3d 155 (citing Restatement (Third) of Agency § 7.05(1) (2006) ("A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent.")). In order to prevail on this claim, Plaintiff must show: (1) that Mr. Jones acted wrongfully; (2) that Plaintiff was injured by the wrongful act; and (3) that GTI's supervision and retention of Mr. Jones was negligent and caused Plaintiff's injury. *Deflon v. Sawyers*, 2006-NMSC-025, ¶ 25, 139 N.M. 637, 137 P.3d 577.

Defendants argue in a cursory manner that Plaintiff has failed to allege that Mr. Jones did a wrongful act. However, Mr. Jones' use of a racial epithet along with his decision to discharge Plaintiff because she opposed his use of the racial epithet suffices as a wrongful act for purposes of pleading this claim. And, GTI's allowance of Mr. Jones' behavior and its apparent failure to question Mr. Jones' motive in firing Plaintiff also supports the allegation of this claim.

F.    Plaintiff has stated a claim of civil conspiracy in Count IX.

Plaintiff alleges that Defendants conspired to inflict harm on the Plaintiff, to interfere with her employment, to violate her rights under the NMHRA and Title VII, and

to breach and wrongfully terminate her employment and contract. (FAC ¶ 92.) To establish a civil conspiracy, a plaintiff must show: (1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts. *Vigil v. Public Service Co. of N.M.*, 2004-NMCA-085, ¶ 20, 136 N.M. 70, 94 P.3d 813. The purpose of a civil conspiracy claim is to impute liability and make members of the conspiracy jointly and severally for the torts of any of its members. *Ettenson v. Burke*, 2001-NMCA-003, ¶ 12, 130 N.M. 67, 17 P.3d 440. Defendants argue that Plaintiff's conspiracy claim fails as a matter of law because "Plaintiff does not have an actionable civil claim against Defendants under Title VII, the NMHRA, or any other law." Motion at 24. In other words, Defendants maintain that the dismissal of Plaintiff's underlying claims necessitates the dismissal of Plaintiff's conspiracy claim. Because the Court has determined that Plaintiff has asserted viable Title VII, NMHRA, and wrongful discharge claims, the Court rejects Defendants' request for dismissal of Plaintiff's conspiracy claim. *See Seeds v. Lucero*, 2005-NMCA-067, ¶ 25, 137 N.M. 589, 113 P.3d 859 (finding sufficient allegations to state civil conspiracy claim in complaint that alleged all defendants agreed and combined to commit various wrongful acts). At this stage, this claim will be allowed to go forward.

IT IS ORDERED that DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. No. 85) is DENIED.

_____
SENIOR UNITED STATES DISTRICT JUDGE